Green, Judge,
delivered the opinion of the court:
The plaintiff, LeRoy Collins, is Receiver of the National Construction Company, a Florida corporation, which on July 14, 1930, entered into a contract with the United States to furnish all labor and materials and perform all work required for the demolition of certain buildings and remodeling of and construction of certain other buildings at Richmond, Virginia. On September 10, 1930, the National Construction Company entered into a contract with the Waldrop Heating & Plumbing Company to do certain of the work and install the mechanical equipment required by the contract with the defendant, as shown by Finding 3.
The contract and specifications entered into between the National Construction Company and the United States provided among other things as follows:
17. Manner of conducting the work. — The building will be occupied during the life of the contract hereunder. The work shall be so done as to cause the least possible-interruption to the Government business. The contractor shall provide satisfactory temporary facilities to permit all business to be continued during the operations under the contract.
$ ‡ $
38. Temporary heat. — The contractor shall provide temporary heat as necessary to protect all work and materials against injury from dampness and cold, to the satisfaction of the Construction Engineer.
$ ‡ * . %
1019. Temporary heat. — The contractor is to furnish temporary heat to portions of building occupied during construction.
*380 One of the items called for under the contract with the Government was the removal of the old heating plant in the building which was being remodeled and replacing it with a new and larger plant. That item was covered by the contract between the contractor and its subcontractor, the Waldrop Heating & Plumbing Company. This work was to be carried on while the building was occupied and heat was to be furnished by the contractor pursuant to paragraph 1019 set out above. The subcontractor planned to carry out this work by removing only a part of the heating equipment and replacing the equipment removed with new equipment before proceeding with the further removal of the old equipment, thus leaving enough of the heating system in place and in operation to enable it to supply heat for the occupied portion of the building.
When the subcontractor entered into its contract with the contractor the former understood that it was to commence work within thirty days thereafter and it was ready within such time to proceed with the work, including work in the old building. In October 1930 the subcontractor began work in the new building being constructed, and in November and December 1930 applied for permission to begin work on the heating plant in the old building, but permission was denied. Request was renewed in January 1931 and again denied Permission was not finally granted until about May 15,1931, when the subcontractor was permitted to have access to the old building for the purpose of beginning work on the heating plant.' Thereafter work on both the old and new buildings required by the contract was carried on concurrently. The subcontractor completed its work on November 24,1931, and the contractor completed the work under the principal contract about August 1, 1932, when the work was accepted by the United States. If the work had not been delayed by failure to gain access to the old building until about May 15, 1931, and the subcontractor had not been subjected to further delay through changes made in the plans and specifications, the subcontractor would have completed its contract by October 1, 1931, and the contractor would have completed its part, insofar as necessary to be relieved of any necessity to furnish temporary heat, by November 24,1931.
*381 During the heating season of 1930 and 1931 the United States supplied the heat required for the old building and made no request upon either the contractor or subcontractor to furnish such heat; and likewise furnished such heat as was required for the period from October 1 to October 24, 1931. From the date last named to November 24, 1931, the subcontractor furnished heat for the old building, and thereafter, until the completion of the contract of the contractor with the United States, the contractor furnished the required heat.
The total cost of furnishing the heat supplied by the Government during the 1930-1931 heating season and for the period from October 1 to October 24,1931, was $4,883.61. The cost of furnishing heat by the subcontractor from October 24 to November 24, 1931, was $462.29, and by the contractor from November 24, 1931, to May 1932, the end of the 1931-1932 heating season, was $3,936.98.
About October 1931 the question arose as to who was required under the contract to furnish heat for the old building. In response to a request for an interpretation of the contract the supervising architect replied, with reference to the extension of the Post Office building and in regard to paragraph 1019 of the specifications calling for temporary heat: “As this was to be a partially occupied building it was contemplated that the Government’s regular fireman and Government fuel for the existing building would be used.” This ruling was later reversed by the supervising-architect by a letter to the contractor on December 5,1931, in which it was held that the contractor was required “to furnish the necessary heat in the occupied portions of the building in addition to the temporary heat to protect the work.”
In the final settlement by the defendant of its contract with the contractor, defendant determined the “completion date” under the contract was November 24, 1931; that is, the date when the contractor would have been able to complete the work under the contract and be relieved of the responsibility for furnishing temporary heat. On the ba,sis of that determination, the defendant withheld from the amount otherwise due the contractor the sum of $4,883.61, representing the cost to the defendant of furnishing heat to the *382 old building during the 1930-1931 heating season ($4,455) and the cost to the defendant for a like purpose for the period October 1 to October 24, 1931 ($428.61). The defendant, however, credited the contractor with the cost to the contractor of furnishing temporary heat after the completion date, November 24, 1931, to the end of the 1931-1932 heating season, such credit amounting to $3,936.98.
• After the amount of $4,883.61 had been withheld by the defendant from the amount due the contractor, the contractor withheld a like sum from the amount due the subcontractor. The amount withheld hajg not been paid by the United States either to the contractor or the subcontractor and is the amount sought to be recovered in this suit. The plaintiff conceded in argument that the defendant furnished heat for the period and at the cost as stated above.
The plaintiff’s case depends upon the construction of the specifications of the contract which relate to, or provide ,for, the contractor’s obligation for supplying heat. The fir,st of these, paragraph 17 of the specifications, set out above, is general in its terms and has given rise to no controversy between the parties.
Paragraph 38 relates only to the supplying of temporary heat for the protection of work and materials, and its meaning is not in dispute.
Paragraph 1019 of the specifications provides that the contractor is to furnish temporary heat to the portions of the building occupied during construction. The plaintiff contends that the contract contemplated the remodeling of an existing building which was to be occupied during the' life of the contract and that this paragraph had application only to the original or existing building.
No work was being carried .on in or about the existing-building during the time the defendant was furnishing heat and the extension or new building was not occupied during-its construction.
• We think the construction placed upon the provisions of' the contract by the plaintiff is correct and it will be observed that the parties acted accordingly; the defendant,, without objection, furnishing the heat for which it now contends it should be paid. Also that the greater part of* *383 the beat was furnished during a period when the defendant refused to permit the work to be carried on in the existing building, and it is obvious that until construction began temporary heat was not required. The heat which defendant supplied wap the regular heat, using its own equipment and employees. It should also be noted that the supervising architect at first ruled in accordance with plaintiff’s contention. Construction was going on in the existing building during the period from October 1 to October 24, 1931, and during that period, under the language of the specifications, it would appear that the contractor was obligated to supply temporary heat, the cost of which was $428.61. The Government withheld $4,883.61. Deducting the amount of $428.61, for which the plaintiff is liable, we find there ip due on the contract $4,455.

Counterclaim

The defendant pleads a counterclaim against the plaintiff in the amount of $14,155.18, representing the excess costs incurred in completing the work under a contract made by the United States with the National Construction Company for the construction of a post office and courthouse at Terre Haute, Indiana, as shown in Finding 14.
Because of unsatisfactory progress the contractor’s right to proceed under the contract referred to above was terminated. The surety on the bond of the defaulting contractor not having elected to complete the work under the contract, a contract was awarded for the completion of the work as shown in Findings 16, 17, and 18, the Government making claim for the excess costs resulting from the default of the National Construction Company as shown in Finding 19.
There is no dispute as to the facts on which the counterclaim is based or the amount of expense incurred by the Government. The sole defense to the counterclaim is a claim that the new contract departed substantially from the original terms of the contract and thereby increased the costs of completion, and it is said that it is held in the case of Rosenberg v. United States, 76 C. Cls. 662, that in *384 such a case the increased costs cannot be charged to the defaulting contractor. We think that what was said in the opinion cited, when taken as applied to the facts in the case and analyzed, means that where the increased costs arise from a departure from the original contract they cannot be charged to the defaulting contractor. In the case cited there was a very substantial departure from the original contract terms in that the new contract required new work at an increased cost. In the case before us the new contract provided alternatively for new work at an increased price but if this new work was performed the price was to be paid by the defendant and no charge is now made against the plaintiff on account of any new work. What the defendant seeks to recover is the excess expense caused by the contractor’s default in completing the work required by the original contract. It asks for $647.20, the cost of correction of certain work; $30 for water costs during the period when the new contractor took over the work; $14,-007.62 rent paid for temporary post office quarters from the last date for completion of the first contract to the time when the contract work was finished; and, $4,494.30 for constructing engineer’s salary for the same period. All these items arose directly from the failure of the plaintiff to comply with the original contract. These items when added to the amount paid the National Construction Company, $388,304.63, make the actual cost to the Government $457,336.75. The difference between this last-named amount and $442,581.57, the cost under the original contract, is $14,755.18, which is the total., excess cost to the United States.
There were some additional provisions in the contract between the United States and the completion contractor which are set out in Finding 17. These provisions required the contractor to use domestic materials and to prepare detailed reports for the Labor Department. There is nothing in the evidence, however, to show that these provisions increased the cost of the completion contract, and the nature of them is such that we cannot presume that any substantial increase would result therefrom. We think the *385 increased cost, if any, would be merely nominal, and it is apparent that no more time would be required.
It is argued, however, that the specifications for the work under the completion contract contained a paragraph, designated as X21, which required work not provided for under the original contract and not covered by the separate bid made by the completion contractor. All that the court has before it to support this claim is the statement in the commissioner’s Finding 18 that paragraph X21 “related to the treatment of the floors.” Even if the original contract did not specify the treatment which the floors would receive, there would be an implied contract that they should be properly finished. The court will take judicial notice that there are various ways of treating floors and it is probable that some require more time and expense than others, but as we do not know what treatment was required by the new contract and whether or not it would require any more time or expense than that provided for by the original contract, we cannot say that either the time or expense was increased by reason of this provision. It will be observed that the new contract contained a direct reference to additional work which was enumerated. We think that if the provision of the contract relating to the treatment of floors required any additional work or contained anything more than an amplification of what was contained in the original contract it would have been included in the provisions for additional work. As the cost of the new work was to be paid by the defendant and the other changes in the contract are not shown to have increased either the cost of the work or the time required in any substantial degree, we can see no reason why the defendant should not recover the excess expense caused by the failure of plaintiff to comply with the terms of the contract.
It is argued on behalf of plaintiff that the subcontractor completed its work and that it was not responsible for the failure of the plaintiff to comply with its contract and therefore should be paid, but the defendant had no contract with the subcontractor and was not bound to it in any way. The misfortune of the subcontractor is due to its making a contract with an irresponsible party.
*386 The defendant is entitled to recover the amount of the excess cost incurred in completing the contract, which as above stated is $14,755.18. Deducting from this sum the $4,455.00 which we find was due plaintiff under the contract upon which it began suit we have $10,300.18, for which amount judgment will be rendered in favor of the defendant.
It is so ordered.
Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.