Whitaker, Judge,
delivered the opinion of the court:
Cases Nos. 44004 and 44067 are both suits for the recovery of increased costs alleged to have been incurred as the result *616 of the enactment of the National Industrial Recovery Act. They are brought under the Act of June 25, 1938 (52 Stat. 1197), entitled “An Act to confer jurisdiction on the Court of Claims to hear, determine, and enter judgment upon the claims of Government contractors whose costs of performance were increased as a result of enactment of the National Industrial Recovery Act, June 16, 1933.”
In No. 44004 the plaintiff contracted with John B. Kelly, Inc., to furnish it the necessary brick, hollow tile, and salt-glazed tile for the construction of a Post Office at Philadelphia, Pennsylvania, and in No. 44067 plaintiff contracted with the said John B. Kelly, Inc., to furnish it the necessary brick, hollow tile, and salt-glazed tile for the construction of a Naval hospital and other buildings connected therewith at Philadelphia, Pennsylvania. The materials furnished for the Post Office building at Philadelphia were furnished by plaintiff’s East Canton, Ohio plant, and the materials used in the construction of the Naval hospital were furnished by plaintiff’s Perth Amboy, New Jersey, and its Lorrilard plant.
Prior to the enactment of the National Industrial Recovery Act of June 16, 1933 there was a condition of severe financial depression in the structural clay products industry. Plaintiff was in an acute financial condition verging on bankruptcy, finally culminating in a reorganization under 77B of the Bankruptcy Act. Wages were at a very low level, varying from a high of 22yz cents an hour in the North, to a low of 10 cents an hour in some parts of the South. Laborers, quite naturally, were dissatisfied with the wages received, but the proof indicates that business conditions were so bad that nothing could be done about it.
One of the declared purposes of the National Industrial Recovery Act was “to improve standards of labor,” and to effectuate this purpose, among others, the President Avas authorized to issue licenses when he should find that any trade or industry was engaging in destructive wage practices, price cutting, or other activities contrary to the policy of the Act. Under section 7 employers were required to assure the right of collective bargaining to their employees, and were prohibited from requiring an employee to join a *617 company union and from preventing him from joining a labor organization of his own choosing, and employers were required to comply with the “maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President.” There were other provisions intended to assure better pay,, lesser hours, and improved conditions of employment.
After the passage of this Act plaintiff’s employees gave voice to their dissatisfaction with their rates of pay. Then on July 28, 1933 the President called upon industrialists to sign the President’s Reemployment Agreement, which prescribed 40 cents an hour as the minimum wage and 40 hours a week as the maximum workweek, and agitation among plaintiff’s employees for increased wages increased.
On account of the difference in the wages prevailing in plaintiff’s northern and southern plants plaintiff did not desire to sign the President’s Reemployment Agreement, but was diligent in its efforts to agree with other members of its industry on a code of fair competition. In an effort to induce its employees to defer their demand for increased wages until after the adoption of a Code for the industry plaintiff addressed a communication to the superintendents of its various plants, the first paragraph of which reads:
You are no doubt being asked by your employees what the company is doing in relation to government codes.
The letter then sets out the efforts that were being made to agree upon a Code, and stated that plaintiff was not signing the President’s Reemployment Agreement because it hoped to agree on a Code which would more nearly meet conditions in this industry than the PRA. The letter concluded:
You are authorized to tell your employees that regardless of whether we are working under an approved code by September first or not, action will be taken on our part to increase wages and reduce working hours. It is hoped that between the fifteenth of August and the first of September that this matter will have been satisfactorily settled and we will be working according to government ruling.
*618 The employees in both the Perth Amboy plant (case No. 44067) and in the East Canton plant (case No. 44004) were dissatisfied with this arrangement and demanded that plaintiff at once sign the President’s Reemployment Agreement. This plaintiff would not do, but at its East Canton plant, in an effort to satisfy its employees, it agreed, on August 22, 1983, to increase their wages to 25 cents an hour, an increase of 5 cents an hour, and it also agreed that not later than September 1, 1933 it would sign the PRA and pay the wages therein specified, unless in the meantime a Code had been adopted and approved. From this date, August 22, 1933, the plaintiff paid these increased wages. On September 1, 1933 no Code had been adopted or approved, and accordingly plaintiff, in conformity with its promise, signed the PRA on September 2, 1933, and thereafter paid its employees the minimum wage specified therein, and at the same time equitably adjusted the wages of its employees who had been receiving more than the minimum wage specified by the PRA. This resulted in an increase of 15 cents an hour over the amount agreed upon on August 22, 1933. On December 7, 1933 a Code for the industry was adopted and approved. This provided for a minimum wage of 37% cents an hour ,at both the East Canton and Perth Amboy plants. Plaintiff, however, continued to pay the minimum wage of 40 cents an hour after the adoption of the Code.
In case No. 44004 (the East Canton plant) the defendant admits that plaintiff is entitled to recover its increased costs incident to the increase in wages from 25 cents an hour, the August 22, 1933 minimum, to 40 cents an hour until December 7, 1933, and thereafter the increase from 25 cents an hour to 37% cents an hour, the minimum prescribed by the Code. This total amount is $6,739.58.
A majority of the court is of the opinion that the plaintiff is entitled to recover the increase from 25 cents an hour to 40 cents an hour even after the adoption of the Code, although the Code prescribed a minimum rate of 37% cents an hour. Plaintiff was paying 40 cents an hour at the time of its adoption, and as a practical proposition it could not reduce its wages to the minimum prescribed by the *619 Code, in view of the dissatisfaction which this necessarily would have caused among its employees. It was required by the President’s Eeemployment Agreement, adopted under the National Industrial Eecovery Act, to pay the minimum of 40 cents an hour, and the National Industrial Eecovery Act having established this as the minimum wage, a majority of the court is of the opinion that its continuation to pay this minimum wage was the direct result of the enactment of the National Industrial Eecovery Act, although under that Act it was later agreed that the minimum wage should be 371/2 cents an hour. The difference between 37% cents an hour and 40 cents an hour after December 7, 1933, amounts to $1,036.56.
Defendant also says that plaintiff is not entitled to recover the 5-cent increase granted on August 22,1933. It says that this increase was not the result of the enactment of the National Industrial Eecovery Act, but was the result of long-standing labor agitation. But there is no proof in the record that there was any labor agitation prior to the passage of the National Industrial Eecovery Act. The inference is to the contrary.
It is true that plaintiff did not sign the PEA until after the increase was granted, but it was granted as the direct result of the agitation resulting from the passage of the National Industrial Eecovery Act and from plaintiff’s failure to sign the President’s Eeemployment Agreement promulgated thereunder. The increase was granted as the immediate result of the demand of its employees that it sign the President’s Eeemployment Agreement. It was granted in an effort to induce them to postpone this demand. It is plain, therefore, that the increase was directly attributable to the passage of the National Industrial Eecovery Act.
This increase in wages increased plaintiff’s costs at the East Canton plant (case No. 44004) by the amount of $2,592.05. This added to the increased cost of $1,176.14, as a result of the "increase from 25 cents an hour to 40 cents an hour, makes a total increased cost of $10,368.19. We are of opinion that the plaintiff is entitled to recover this amount. Judgment therefor will be entered in case No. 44004. It is so ordered.
*620 The facts in case No. 44067 (the Perth Amboy plant) differ but little. There was the same agitation for increased wages after the passage of the-National Industrial Recovery Act; there was the same dissatisfaction with plaintiff’s refusal to sign the President’s Reemployment Agreement; but, in this case the employees in the Perth Amboy plant expressed their dissatisfaction in more positive fashion; they struck. The strike was called on August 2,1933, almost immediately after receipt of plaintiff’s letter of July 31, 1933. On that date H. Sieber, Acting Secretary of the union at Perth Amboy, wired the National Recovery Administration, stating:
Employees of National Fireproofing Co. left service on account of company rejecting blanket code July 31. Please advise what action employees should take. Men refuse to return to work until it is adopted.
This telegram was referred to the National Labor Board, and on August 17, 1933 the Secretary of this Board wrote plaintiff quoting the telegram and asking to be advised of the present status of the matter ánd what the company was going to do about it. Prior to receipt of this letter, however, plaintiff had met with its striking workmen and had agreed to increase their wages from 22% cents an hour to 40 cents an hour, the minimum prescribed by the President’s Reemployment Agreement, and it also agreed, as it had done at the East Canton plant, that it would sign the PRA on September 1, 1933, if in the meantime a Code of Fair Competition had not been adopted.
As in the case of the East Canton plant, plaintiff continued to pay this minimum of 40 cents an hour, even after the adoption of the Code of December 7, 1933, and a majority of the court is of the opinion that it is entitled to the increase from 22% cents an hour to the 40 cents minimum, even after the adoption of the Code.
Defendant says in its brief in this case also that this increase of 17% cents an hour was the result of “longstanding agitation by plaintiff’s employees for higher wages,” and that the National Industrial Recovery Act did nothing more than aggravate an “already serious situation.” The record, however, does not sustain this statement. There *621 is no proof of any agitation prior to the adoption of the National Industrial Recovery Act on June 16, 1933. No doubt there was dissatisfaction, but, so far as the record discloses, expression was never given to it until aftei the passage of this Act. After the Act was passed there was agitation and it increased after the promulgation of the President’s Reemployment Agreement, and it culminated in a strike when plaintiff on July 31,1933, notified its employees that it would not sign the agreement until after September 1,1933. The increase granted, therefore, was the direct result of the passage of this Act.
Each of these cases must be decided on its own facts, but see McCloskey v. United States, No. 44003, 98 C. Cls. 90. We do not think that Dravo v. United States, 93 C. Cls. 745, is in conflict herewith.
The increased cost incident to an increase of wages to 40 cents an hour from August 4, 1933, amounts to $2,929.25. This amount plaintiff is entitled to recover in case No. 44067. Judgment therefor will be entered. It is so ordered.
Madden, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.