Whitaker, Judge,
delivered the opinion of the court:
The plaintiff had a contract with the defendant for the dredging of a portion of Raisin River at Monroe Harbor, Michigan. In carrying it out it encountered considerably more hardpan than it had expected. It sues to recover addi *111 tional compensation, claiming that it is entitled to an equitable adjustment on this account. It also sues for the cost of removing some material which collected in the channel of the river after the dredging had been done, and to recover liquidated damages deducted, and, finally, for increased costs incurred as the result of the enactment of the National Industrial Recovery Act. (U. S. Code, Title 15, section 701)
This is another case in which there has been joined two separate and distinct causes of action, one a suit under a contract, and the other a suit arising under an Act of Congress. This is bad pleading, but since this case has been pending here for some time we overlook it and proceed to consider the two causes of action.
The largest claim is that resulting from the removal of a large quantity of hardpan. The plaintiff says that no one expected to encounter this hardpan and, therefore, for this it is entitled to an equitable adjustment under article 4 of the contract. The defendant says that it gave no warranty that hardpan would not be encountered, and in no way misrepresented the situation, and that article 4 is inapplicable.
In 1932 the defendant issued a “Preliminary Notice of the Invitation for Bids for Dredging in Monroe Harbor, Michigan.” This notice said:
This office expects to invite proposals prior to the opening of the 1933 working season for the dredging of approximately 3,800,000 cubic yards of material at Monroe Harbor, Michigan — the work to commence on or before the beginning of the season and to be completed by December 1, 1933. In order that prospective bidders may have an opportunity to examine the area of the proposed work before the close of the present season, the following information relative thereto is given.
❖ ❖ ❖ # #
The material to be removed is believed to be sand, clay, and boulders. However, the price bid per cubic yard for dredging will include the cost of removing all materials encountered, including snags, stumps, trees, underbrush, piling, revetment, stone-filled cribs, and the concrete sub-structure. of the Monroe Light. The removal of ledge rock, if encountered, will not be *112 required. Probings made by this office indicate that ledge rock will be encountered, if at all, only at the extreme upper end of the proposed work.
* * * ¡I: #
Copies of a preliminary location map showing the general features of the proposed work are available in this office and may be obtained, without charge, on request.
The information and data given in this notice are preliminary and tentative only, and are subject to change without notice. More detailed information will be issued at the time of invitation for bids.
Plaintiff received this notice and sent two of its employees to make an investigation of the site. They probed the area to be dredged with an iron pipe and bored 24 or 25 test holes with an auger. This auger penetrated all material in the area, including hardpan, but excepting ledge rock and boulders, and indicated whether the material through which it had passed was hard or soft, but it did not accurately indicate the character of the material.
Subsequent to this the defendant issued its formal invitation for bids. To this was attached the specifications. Paragraph 13 thereof reads as follows:
13. Character of materials. — The materials to be removed are believed to be sand and clay, with some hardpan and _ boulders, and, in addition: revetment, foundation piling, underbrush, stumps, snags, trees, etc., along the banks of the United States and Monroe Canals; piling, stone-filled cribs, etc., within the contract area; the concrete foundation of Monroe Light; refuse from the Monroe paper mills; and possibly buildings or portions thereof not removed by the owners from within the limits of the proposed work.
Bidders are' expected to examine the work and decide for themselves as to its character and to make their bids accordingly. In the event that materials, structures, or obstacles of a materially different character are encountered during the progress of the work, and the cost of their removal or satisfactory treatment obviously would be, in the opinion of the contracting officer, either in excess of, or less than the unit price bid by the contractor, the contracting officer, in either alternative, will then proceed in accordance with the provisions of article *113 4 of standard Government Form No. 23, or any authorized revision thereof.
Attached also to the invitation for bids was a map showing the location of places probed by the defendant. This map contained the following data on probing:

Data on probing

The primary purpose of the above probings was to ascertain the existence of ledge rock, and not to discover the character of materials to be dredged. This responsibility was placed upon the bidder, but the defendant furnished it with such information as it had.
Although this map showed that in a number of different holes the probing was “hard all the way,” requiring from 125 to 250 blows of a 100-pound hammer to drive the rod from 7 to 11 feet, the defendant did not deduce therefrom that hardpan necessarily would be encountered, but it thought that it might be, and hence included in its specifications of materials to be dredged, “some hardpan.” However, when the defendant made its estimate of what the work ought to cost, it did not figure on any hardpan; but this fact was not known to the plaintiff at the time it submitted its bid.
*114 The plaintiff encountered very much more hardpan than had been expected. The defendant estimated that of the materials dredged about 175,000 cubic yards were hardpan. The plaintiff says that there were about 700,000 cubic yards. Neither party’s figures are based upon accurate information, but it is evident that quite a good deal more hardpan was encountered than anybody expected.
However, there was certainly no misrepresentation by the defendant, nor was there any warranty that no hardpan would be encountered. The specifications put plaintiff on notice that it might expect to encounter some hardpan, and bidders were required “to examine the work and decide for themselves as to its character and to make their bids accordingly.”
But plaintiff says that whether or not there was a misrepresentation, it is entitled to an equitable adjustment under article 4 of the contract. This article provides in part: “Should the contractor encounter, or the Government discover, during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, * * *” the attention of the contracting officer was to be called thereto and he was to investigate the conditions, and if they were found to be materially different, then he was to make an equitable adjustment of the amount to be paid and the limit of time within which the contract was to be completed. Before plaintiff is entitled to the benefit of this article it must show that the conditions at the site were materially different from those shown on the drawings or indicated in the specifications. They were not different from the conditions shown on the drawings. These drawings showed that certain probings had been soft for a certain distance and “hard all the way” in others. So far as it appears, that information was correct.
Were conditions different from those indicated in the specifications ? Paragraph 13 of the specifications provided:
The materials to be removed are believed to be sand and clay, with some hardpan and boulders, and, in addition: revetment, foundation piling, underbrush, stumps, snags, trees, etc., along the banks of the United *115 States and Monroe Canals; piling, stone-filled cribs, etc., within the contract area; the concrete foundation of Monfoe Light; refuse from the Monroe paper mills; and possibly buildings or portions thereof not removed by the owners from within the limits of the proposed work. ■
$ $ ‡ $
This was an indication that the natural riverbed was principally sand and clay, with a minor amount of hardpan and boulders, and that there were, in addition, the other things mentioned. It seems clear to us that a contractor would understand from this specification that the amount of hardpan to be encountered would not be great. If in fact the amount, actually encountered was as great as claimed by the plaintiff, we would conclude that the conditions did materially differ from that indicated by the specifications. Plaintiff says that of the 1,592,608 cubic yards of material dredged, 714,741 cubic yards were hardpan. This is about fifty percent, much more than was indicated by the expression “some hardpan.” On the other hand, the defendant says that 175,186 cubic yards were hardpan, or 11 percent. We think the expression “some hardpan” would put the contractor on notice that it might expect as much as 11 percent.
Section 13 of the specification provides that in the event that materials are encouñtered of a character materially different from those indicated in the specifications, or discovered as a result of the bidder’s inspection, and the cost of their removal is greater than the price bid, then the contracting officer was required to proceed in accordance with article 4 of the contract. Article 4 requires him to investigate conditions, and if found materially different from those indicated, to make such changes as he might find necessary, and to increase the price to be paid in such amount as he should consider equitable.
The proof shows that he did investigate conditions, and found that of the materials dredged only eleven percent were ' hardpan, instead of fifty percent, as claimed by the plaintiff. This finding is conclusive on us, unless we determine that it is arbitrary or grossly erroneous, because of the provisions of article 15, providing that—
*116 * * * all disputes concerning questions of fact aris-under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision shall be final and conclusive upon the parties thereto as to such questions of fact. * * *
There is no proof that this finding was arbitrary or grossly erroneous. The contracting officer’s figures are not accurate, but neither are those of plaintiff. Which figures are the more accurate we are unable to say. In such circumstances, it is obvious that we cannot say that the contracting officer’s action was arbitrary or grossly erroneous. Therefore, we must take it as true that only 11 percent was hardpan. This was not a material difference from the conditions indicated by the specifications.
Article 15 of the contract also forecloses plaintiff’s recovery for the removal of the deposits in the channel after it had been dredged. The plaintiff claims that the removal of this material comes under article 17 of the specifications, while defendant says it comes under article 21.
Article 17 provides:
Shoaling. — Should the last examination of the contract work, extended to include the entire area, show shoaling since the previous dredging under the contract, or shoaling for which the contractor is evidently not responsible, and which shall include shoals in the finished channel formed by the natural lowering of side slopes, between the time of dredging and that of the last examination herein referred to, redredging at the contract price, so far as permitted by available funds, may be done if agreeable to both the contractor and the contracting officer.
Article 21 provides:
21. Misplaeed material. — Any material that is deposited elsewhere than in places designated or approved by the contracting officer will not be paid for, and the contractor may be required to redredge such material and deposit it where directed.
Should the contractor, during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which in the *117 opinion of the contracting officer may be dangerous to or obstruct navigation, he shall recover and remove the same with the utmost dispatch. The contractor shall give immediate notice, with description and location of such obstructions, to the contracting officer or inspector, and when required shall mark or buoy such obstructions until the same are removed. Should he refuse, neglect, or delay compliance with the above requirement, such obstructions may be removed by the contracting officer, and the cost of such removal may be deducted from any money due or to become due the contractor, or may be recovered under his bond.
Plaintiff claimed that the material it was required to remove was refuse from a paper mill up the river from the site of the work. The contracting officer found that it was material which the plaintiff had placed on the bank and which had sloughed off into the water. The plaintiff appealed from the finding of the contracting officer, but his decision was affirmed. Article 15 makes his decision final and conclusive, and we cannot say that this decision was either arbitrary or grossly erroneous.
Plaintiff’s claim for the remission of liquidated damages is based upon the discovery of an unexpected amount of hard-pan. Article 9' relieves the contractor from the assessment of liquidated damages for delays due to “unforeseeable causes beyond the control and without the fault or negligence of the contractor.” The contractor was required to notify the contracting officer of any delays, who in turn was required to “ascertain the facts.and extent of the delay, and his findings of facts thereon shall be final and conclusive, subject to appeal to the head of the department * * The contractor first complained of hardpan on December 1, 1933, after the work had been going on for ten months. The contracting officer held that it was not entitled to the extension of time it requested. This ruling was affirmed by the Chief of Engineers. We find that it was neither arbitrary nor erroneous, and it is, therefore, conclusive.
Plaintiff’s last claim is for increased costs incurred as a result of the enactment of the National Industrial Recovery Act.
*118 Plaintiff’s instant contract was exempt from the provisions of the National Industrial Recovery Act and the President’s Reemployment Agreement and the Code of Fair Competition ; nevertheless, considerable pressure was brought to bear on plaintiff to increase wages and shorten hours on this contract as prescribed in the President’s Reemployment Agreement, and plaintiff finally did so. At first the contracting officer had told plaintiff that it would be required to comply with the National Industrial Recovery Act, and that the contract price would be adjusted accordingly; but later plaintiff was advised that the Chief of Engineers had overruled the contracting officer and had held that the contract would not be converted to one under the National Industrial Recovery Act. As unreasonable as it may seem, the contracting officer, nevertheless, transmitted to plaintiff later a complaint received by the Chief of Engineers of plaintiff’s failure to comply with the President’s Reemployment Agreement on this contract, and asked plaintiff what it had to say about it.
A little later the Central Labor Union got after plaintiff and demanded that it pay PRA wages from then on, and, in addition, to pay its employees back PRA pay. The plaintiff replied that it would be glad to do so if the defendant would reimburse it. The Union then took up, with the contracting officer the matter of whether or not the Government would reimburse the contractor, and reported to plaintiff that the contracting officer had said it was entitled to reimbursement under the Act of 1934 (U. S. Code, Title 41, section 28). The plaintiff took the matter up with the contracting officer directly, who confirmed what he had told the Union people.
Then the Monroe Business Men’s Association came to plaintiff urging that it comply with the President’s Reemployment Agreement.
Yielding to all this pressure, plaintiff increased wages of some of its employees from 30 to 40 cents an hour, and continued to pay these wages until the contract was completed. This increased its costs for wages and compensation insurance by the amount of $1,059.60. Except for the passage *119 of the National Industrial Recovery Act, neither the contracting officer nor the Labor Union nor the Monroe Business Men’s Association would have said a word about the wages plaintiff was paying. This law prompted them to do it; it set in motion the forces that made it necessary for plaintiff to increase wages and, therefore, we are of opinion that the increase can be fairly said to be the direct result of the enactment of the National Industrial Recovery Act. See National Fireproofing Corp. v. United States, Nos. 44004 and 44067, decided June 7, 1943 (99 C. Cls. 608).
Plaintiff is entitled to recover on this account the sum of $1,059.60.
Plaintiff also claims that the increased wages which it paid the crew of the dredge Peru was the result of the enactment of the National Industrial Recovery Act. We do not think so. The crew of this dredge were being paid National Industrial Recovery Act wages on another job. When the dredge and crew were brought to this job plaintiff necessarily had to continue to pay the same wages; but it did not have to bring the dredge and crew to this job; it might have used a different dredge or a different crew whom it would not have been required to pay NIRA wages. The increase was a result of its own act.
Plaintiff lost a great deal of money on this contract, but the defendant was not responsible therefor.
On the whole case the plaintiff is entitled to recover the sum of $1,059.60. Judgment for this amount will be entered. It is so ordered.
Madden, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.