**EVANS ELECTRICAL CONST. CO. et al.**
**v. WM. S. LOZIER, Inc., et al.**

No. 3352.

District Court, W. D. Missouri, W. D.
Aug. 30, 1946.

Lancie Watts and Roy W. Rucker, both of Kansas City, Mo., for plaintiffs.

Thomas A. Costolow, Asst. U. S. Atty., of Kansas City, Mo., Isidor Lazarus, U. S. Dept. of Justice, of New York City, and Philip A. Dergance, of Kansas City, Mo., for defendants.

RIDGE, District Judge.

Plaintiffs in this action seek to recover the sum of $32,561.60 deducted from the payrolls submitted by plaintiffs to defendants under a fixed-fee subcontract entered into between said parties, relative to electrical construction work at the Sunflower Ordnance Works at Eudora, Kansas. The amount plaintiffs seek to recoup represents the salary paid by plaintiffs to one O. E. Carlisle, who acted as Project Manager for plaintiffs in performing the obligations undertaken by them in said subcontract. Plaintiffs' action is in three counts: In the first count plaintiffs seek a declaration of rights of the parties under the subcontract as written, and the recovery of the amount above stated, with interest at the rate of six per cent (6%) per annum on all sums deducted from plaintiffs' payrolls; in the second count plaintiffs seek a reformation of said subcontract if the Court, under Count 1, declares and determines by its judgment that plaintiffs cannot recover under the subcontract as written, and, un-

der Count 3, plaintiffs seek to recover the amount of said salary, if the Court decrees reformation of the subcontract. Defendants have filed answer and counter-claim against plaintiffs, claiming damages in the sum of $75,000 for alleged breach, by plaintiffs, of one of the provisions of the subcontract in question.

### Findings of Fact.

The Court has jurisdiction of this action under Title 28 U.S.C.A. § 41(1), the parties-plaintiff and defendants being citizens of different states and more than $3,000 is in controversy in this action. On March 25, 1942, the United States of America (hereinafter called "the Government"), acting through a duly-authorized Contracting Officer of the "War Department," entered into an Architect-Engineer-Construction Management Service Contract with W. S. Broderick and D. G. Gordon, partners d/b/a Broderick and Gordon, and Wm. S. Lozier, Inc., as joint venturers, for the construction of a "war plant" at Eudora, Kansas, known as "The Sunflower Ordnance Works." (Hereinafter the United States of America will be referred to as "the Government"; and Broderick and Gordon and Wm. S. Lozier, Inc., the joint adventurers, will be referred to as "General Contractor," "Prime Contractor," or "The A-E-M.") The contract so entered into by said parties was first evidenced by a "letter of intent" from the Government to the Prime Contractor. While operating under such "letter of intent" the Prime Contractor entered into a written agreement, dated May 1, 1942, with Evans Electrical Construction Company and Lord Electrical Company, d/b/a joint adventurers under the name of Evans-Lord Electrical Constructors (who, hereinafter, will be referred to as "Subcontractor") for the doing of the electrical construction work on the project in question. The agreement so entered into is entitled "Letter Subcontract" and marked Exhibit "21" herein.

Prior to the acceptance of said "Letter Subcontract" the plaintiffs, under date of May 1, 1942, entered into a joint-venture agreement (Exhibit "3") to perform the subcontract in question, under the name of Evans-Lord Electrical Constructors. Said joint-venture agreement provided for the creation of a committee or board "consisting of one of the officers of each of said parties" to said agreement. The committee or board so created was to "constitute the administrative body" of said joint-venture "with all the powers, duties and obligations deemed necessary by said committee to properly negotiate for" the subcontract above referred to and, "to manage, control, conduct and perform all of the covenants, promises and agreements set out in the" subcontract. Said joint-venture agreement also provided that the committee created thereunder should "function and operate only upon the unanimous approval of its two members," and that the two members constituting such committee "shall designate an alternate to represent him at committee meetings in the event it is impossible for the principal to attend." At appropriate Board of Directors' meetings of the plaintiff corporations J. N. St. Clair and J. J. Sullivan were designated as the "Administrative Committee," to represent said joint venture. At a meeting of said "Administrative Committee" on May 1, 1942, J. N. St. Clair was elected Chairman and J. J. Sullivan Secretary and Treasurer of said committee and each member of said committee "designated an alternate to represent him at committee meetings." H. C. Evans was designated alternate for J. N. St. Clair; O. E. Carlisle was designated as alternate for J. J. Sullivan.

Prior to the time O. E. Carlisle was designated as an alternate of the "Administrative Committee" of said joint venture he had been employed by the Lord Electrical Company as Electrical Superintendent in the construction of the Denver Ordnance Plant. The instant Prime Contractor had the A-E-M contract for the construction of the Denver Ordnance Plant also. The officers of the Prime Contractors being acquainted with the fact that Mr. O. E. Carlisle had been in charge of the electrical work at the Denver Ordnance Plant, and that he had performed outstandingly in the construction of said work, wanted him to be placed in charge of the electrical construction work on the Sunflower Ordnance Project. Negotiations were carried on by the Prime Contractor with several

electrical construction firms at which the Prime Contractor sought to induce said firms to place Mr. Carlisle in charge of the electrical work to be done on said project, if a subcontract was negotiated with them. Eventually a subcontract was negotiated with the Evans-Lord Electrical Constructors, as above stated, with the understanding of the parties that Mr. O. E. Carlisle would be designated "Project Manager" and placed in charge of the work to be performed under said subcontract, and that his salary as "Project Manager" would be a reimbursable item of cost under said contract. The Contracting Officer of the United States Army Engineers granted authority to the Prime Contractor to negotiate a fixed-fee subcontract with the Evans-Lord Electrical Constructors on said basis. The proposed negotiations for said subcontract were subject to the approval of such Contracting Officer.

In the course of negotiating said subcontract plaintiffs delivered to defendants a document entitled "Written Negotiations for Services of Contractor" on a United States Engineers' Office "Contract Board Form No. 4," dated May 1, 1942. Said form called for general information concerning the ability of the contractor, executing it, to carry out the contract negotiated for. Item No. 10 contained in said form sought information as to the executive officers, partners, or responsible representative of the Subcontractor who would devote his or their "whole time" to the project in question on a non-reimbursable basis. No answer was made by plaintiffs to such query. Item No. 11, similar in nature, sought information as to which of the officers, partners or responsible representatives of the Subcontractor who would devote "part time" to the project on a non-reimbursable basis. In answer to that query plaintiffs inserted the names of J. N. St. Clair, J. J. Sullivan and H. C. Evans. Item No. 12 called for "Roster of officials, *not* including executive officers, partners, or principal contractor, who will devote *whole time* to the project on reimbursable basis." In answer thereto plaintiffs inserted the following information, among others: O. E. Carlisle; Title, Elec-

trical Project Manager; Age 46; present salary $8,500 yr; proposed salary, $9,000 yr. Item 74, contained in said forms, reads as follows: "Who will be appointed and designated by Contractor as General Manager of this project for all contact between this Contractor and the Contracting Officer?" In answer thereto plaintiffs inserted the name "O. E. Carlisle." Immediately preceding the signatures on said form there is found the following paragraph:

"*O. E. Carlisle* of the firm of *Evans-Lord Electrical Constructors* has been appointed and designated by the Contractor as General Manager of this project for all contact between said Contractor and the Contracting Officer of the Corps of Engineers, who shall also be directly responsible to the Government for the effective coordination of all Associated Contractors on said project."

Also attached to said document was a salary schedule of personnel to be employed by the Subcontractor, showing the classification of each employee and salary range for such classification. "Project Manager" is one of the job classifications listed as a part of the construction personnel in said schedule, with a salary range from *$500–$750* per month. The Area Engineer and Contracting Officer for the Government, for the project in question, approved such negotiations and the salary schedules thereto attached and authorized and approved the execution of a subcontract for doing the electrical work in question.

On May 2, 1942, the day after the above-referred-to "Letter Subcontract" was executed and accepted, Mr. Carlisle filled out a formal application for employment by the Subcontractor. Immediately upon being employed the approval of the Prime Contractor and the Contracting Officer, representing the Government, of his classification as "Project Manager (Electrical)" with a salary rate of $173.07 per week, was secured. After such approval of classification was given, Mr. Carlisle began assembling a working organization to perform the obligations of said subcontract. At the request of the

Prime Contractor and to expedite carrying out the work in question the joint adventurers, on May 15, 1942, passed the following resolution "that O. E. Carlisle shall act as official representative of the firm at the job office of the Sunflower Ordnance Plant project at Eudora, Kansas, with full power to act for the firm in all matters pertaining to the project." A copy of said resolution was thereupon delivered to the Prime Contractor and the Contracting Officer.

From May 1, 1942, to October 1, 1942, the plaintiffs carried out and performed the electrical work assigned to them on the project in question under the above-referred-to "Letter Subcontract." On the last-mentioned date a formal fixed-fee subcontract (Exhibits "19" and "20") was entered into between plaintiffs and defendants on a contract form approved for use by the War Department Engineers, on December 30, 1941, by authority of the Chief of Engineers and the Under Secretary of War. From the time of commencing work on said project, and for a period of 15½ months thereafter, the salary of O. E. Carlisle, as Project Manager, amounting to $9,000 a year, was claimed by plaintiffs as a reimbursable item under the subcontract in question. Defendants and the Contracting Officers for the Government, on the project involved, approved said claim without question as a reimbursable item under said subcontract, and during said period plaintiffs received, from defendants, payment of the amounts so claimed. Throughout the entire term of said subcontract Mr. Carlisle had general superintending control of all electrical work covered by said subcontract. In such capacity he coordinated the work undertaken in said subcontract and executed, on the job, such papers and documents as were necessary to carry out the ministerial obligations thereof. He was not an officer, director or stockholder in either of the two corporations, composing the joint venture of Evans-Lord Electrical Constructors; he did not participate in the fixed-fee paid under the subcontract in question; he did, however, receive from said joint venture the sum of $3,000 a year in addition to the $9,000 claimed by plaintiffs as a reimbursable item under said subcontract. (Payment of said sum was not in violation of any of the provisions of said subcontract but was consonant with the intent expressed therein.) The business office of the joint venture of Evans-Lord Electrical Constructors was located at Kansas City, Missouri, approximately 35 miles east of the project site. The Prime Contractor and Contracting Officer for the Government knew that said business office would be so maintained by plaintiffs during the term of said subcontract, and said parties conducted business with plaintiffs, relating to the management of said subcontract, through said office. Officers of the two corporate joint ventures, composing Evans-Lord Electrical Constructors, were in daily contact with the project and made weekly visits to the site of the project during the work of construction. All formal documents, establishing the policy of such joint venture, were executed by one or more of such corporate officers of said joint venture and the financing and management of said subcontract was provided and handled at the business office of the joint venture in Kansas City, Missouri. Mr. Carlisle, on several occasions, executed, with one of the other members of the "Administrative Committee" of the joint venture, various supplements to the subcontract in question calling for additional construction work, for which the Subcontractor was paid an additional fee. (The subcontract obligated the Subcontractor to accept additional electrical work not provided for in the original subcontract, on certain specified conditions.) He also executed for the Subcontractor the acceptance of defendants' offer to pay the original fee for the work under the original subcontract. (The amount of said fee had previously been agreed to by the parties.) The duties performed by Mr. Carlisle were of a ministerial and supervisory character (directing construction crews and expediting the actual work of construction) rather than of an executive or vice-principal nature.

On August 18, 1943, Lieutenant Colonel E. E. Taylor, then Area Engineer and Contracting Officer for the Government, noti-

fied the Prime Contractor, in writing, as follows:

"Notice of Exception has been received from the General Accounting Office covering the reimbursement of salary for the Project Manager (O. E. Carlisle) of Evans-Lord Electrical Company reading as follows: 'Since the above employee comes within the purview of Article XI, paragraph 4 of the prime contract as resident manager with full power to act for the subcontractor in all matters pertaining to the project through power of attorney dated May 15, 1942, attached to the subcontract, reimbursement for his salary appears unauthorized.'

"Accordingly, a deduction of $11,364.96 covering salary reimbursement up to and including August 1, 1943, plus Federal excise tax payments and State unemployment insurance payments covering this employee will be made from Evans-Lord Payroll No. 68 for the week ending August 14, 1943, now in process of being vouchered. Future payrolls will have a deduction in the amount of the current salary."

A copy of such notice of exception was forwarded by the Prime Contractor to the Subcontractor. The Subcontractor immediately protested, in writing, to the Prime Contractor the deductions so made from its payroll. The General Contractor forwarded said letter of protest to the Area Engineer and Contracting Officer for the Government and, in its letter of transmittal, stated: "We concur in this protest." The Area Engineer and Contracting Officer for the Government transmitted said letter of protest "through channels" to the Chief of Engineers, Contract & Claims Branch, United States Army. In his letter of transmittal the Contracting Officer for the Government stated, among other things, "It is the opinion of the undersigned Contracting Officer that it was the intent of all parties that O. E. Carlisle, Project Manager, would be on a reimbursable basis." The Executive Assistant of the Area Engineer, in charge of said project (one of the "channels" to the Chief of Engineer's Office), in forwarding said letter of protest and letter of the Contracting Officer to

the Chief of Engineers, concurred with the opinion of the Contracting Officer. The Assistant Contracting and Claims Officer for the United States Army in the Chief of Engineer's Office, also concurred in the opinion of the Area Engineer and the Contracting Officer and recommended to the Comptroller General's Office reconsideration of the claim for reimbursement of Mr. Carlisle's salary to the Prime Contractor in the light of the additional data then filed and suggestions there made for and on behalf of the Chief of Engineers. On March 15, 1945, the matter again being submitted to the Contracting Officer for the Government, by the parties, said officer made formal findings of fact and conclusions as to the reimbursability of Mr. Carlisle's salary. The decision reached by such officer was "Inasmuch as the subcontractor has not received the full consideration, intended by the parties and the Contracting Officer to the subcontract (as disclosed by the written and signed negotiations to the subcontract), to be paid for the performance of the work by the subcontractor by reason of the above-mentioned deletions, it is the decision of the Contracting Officer that the project manager's salary should be reimbursed and payment thereof is hereby recommended."

The Contracting Officer for the Government, on the project in question, was authorized to approve all "job classifications" of personnel employed under said subcontract, and was authorized to approve a salary of $9,000 a year for the job classification of "Project Manager." No higher Governmental authority than the Contracting Officer was required for the approval of subcontracts entered into by the Prime Contractor.

By Sec. 1 of Art. III of the Prime Contract, incorporated in the subcontract by reference, the Subcontractor obligated itself "to establish and maintain on office at or near the site of the work under the full-time resident direction" of the Subcontractor, or one or more senior officers thereof, or the Subcontractor could, with the approval of the Contracting Officer, employ some other person to manage said office.

The Court finds as a fact that Sec. 1 of Art. III of the subcontract, above referred to, is ambiguous in that it cannot be determined, as a matter of law, what the parties intended by use of the phrase "at or near the site of the work." The Court finds, as a fact, that at the time of the execution of said contract and throughout the term thereof, the parties thereto understood and agreed that the business office of the Evans-Lord Electrical Constructors in Kansas City, Missouri, 35 miles from the project site, would be under the full-time direction of an officer of said joint venture and that the overall management required to be provided by said subcontract would be administered from said office; that the proximity of said business office, to the site of the work in question, was within the contemplation of the parties by use of the word "near" in the above-referred-to contract provision.

Since the institution of this action the war having ended, construction of the project involved was discontinued and the subcontract in question was terminated as of September 29, 1945.

### Reasons for Conclusions of Law.

The evidence in this case clearly establishes that the Prime Contractor and the Subcontractor, with the approval of the Contracting Officer for the Government, intended to execute an integrated agreement that would provide that O. E. Carlisle should be placed in charge of the work to be performed under the subcontract in question. It is manifest, from the evidence, that the parties intended, and in fact did agree, that Mr. Carlisle would be given superintending control of the ministerial and technical administration of the electrical work to be performed under said subcontract and, in addition thereto, Mr. Carlisle would be appointed and designated by the Subcontractor as "General Manager" of the project for all contact between the Prime Contractor and the Contracting Officer of the Corps of Engineers. The evidence just as clearly establishes that the parties intended and did agree that for the work performed by O. E. Carlisle, as Project Manager, he was to be paid a salary of $9,000 a year and that such salary should be

a reimbursable item of the cost of said project.

The subcontract, as written, makes provision for a "Project Manager," and that his salary shall be a reimbursable item of cost. (See negotiation's salary schedules and Sec. 1h of Art. XI of the prime contract.) The Prime Contractor and Contracting Officer approved the appointment of Mr. Carlisle as "project manager." (Exhibit "14.")

The determination of the proposition whether Mr. Carlisle was "Project Manager" under the subcontract, is a question of fact. In said subcontract the parties agreed upon a procedure as to how a dispute "concerning questions of fact" arising under the subcontract should be decided. Art XI of said subcontract provides that "all disputes concerning questions of fact arising under this subcontract shall be decided by the Contracting Officer." Said article provides for an appeal by either party from the decision of such officer to the Chief of Engineers "whose decision shall be final and conclusive upon the parties."

The evidence in this case clearly establishes that the disputed question of fact arising under the subcontract in question has been submitted by the parties to the Contracting Officer and finally determined in favor of the plaintiffs by the said officer and the Chief of Engineers of the United States Army. The decision of said officers, concerning such question of fact, is conclusive and binding on this Court. Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342; Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 36 S.Ct. 662, 60 L.Ed. 1058; United States v. John McShain, Inc., 308 U.S. 512, 60 S.Ct. 134, 84 L.Ed. 437; English Const. Co. v. United States, D.C., 43 F.Supp. 313; Stiers Bros. Const. Co. v. Broderick et al, D.C., 60 F.Supp. 792; Rego Bldg. Corp. v. United States, 99 Ct.Cl. 445; R. C. Huffman Const. Co. v. United States, 100 Ct. Cl. 80. No fraud or bad faith on the part of either of such officers, in the making of said decisions, is alleged or shown in the evidence. The Contracting Officer and the Chief of Engineers of the United States

Army have determined that it was the intention of the parties to the subcontract in question that Mr. Carlisle was to be employed as Project Manager, and that his salary, at the rate of $9,000 a year, should be and is a reimbursable item of cost under said contract. The defendants concurred in such decision. The defendants did not change their position concerning such fact until after they were ordered, by the Contracting Officer in this case, to reimburse plaintiffs for the amount of the salary paid by them to Mr. Carlisle.

■■ The plaintiffs, within 30 days after receipt of the communication from Major Taylor, noting exception by the Comptroller General's Office to the salary paid Mr. Carlisle, protested to the Prime Contractor the deduction of Mr. Carlisle's salary from its payroll. The Prime Contractor did not then dispute such fact with the Subcontractor, but joined in said protest to the Contracting Officer. The Contracting Officer for the Government did not rule contrary to such protest but gave his written opinion to his superior officer that Mr. Carlisle's salary should be reimbursable. The Area Engineer concurred with the Contracting Officer in a written opinion, addressed to the Chief of Engineers. The Chief of Engineers, acting through his duly-authorized assistant, did not overrule the Contracting Officer or the Area Engineer but, on the contrary, sustained their decision and so expressed himself in writing to the Comptroller General. (See Exhibits "46", "49", "50" and "57.") Under such a state of facts there can be no controversy here between plaintiffs and defendants that Mr. Carlisle was other than Project Manager under the subcontract in question; as such his salary is a reimbursable item of cost under Art. XI, Sec. 1h of the prime contract incorporated in said subcontract by reference. The written decision of said officers is competent evidence in this action in view of the foregoing provision of the subcontract, and defendants' objections thereto are now overruled. United States for use of Wadeford Electric Co. v. E. J. Biggs Const. Co. 7 Cir., 116 F.2d 768.

■ The fact that Mr. Carlisle was paid $3,000 a year by the Evans-Lord Electrical Constructors, over and above the salary paid to him as "Project Manager" does not affect the decision of the Contracting Officer as above stated. Sec. 1h of Art. XI, supra, contemplates that there may be, in the employ of the Subcontractor, personnel who might be paid more than the salary or compensation agreed upon for such employee in the salary schedules attached to the negotiations for the subcontract. Provision is made in the subcontract that if such an employee is paid "any excess over the scheduled amounts shown in the approved salary schedule agreed to at the time of negotiations" then such excess "shall not be reimbursable." Plaintiffs are not claiming, as a reimbursable item, the $3,000 salary so paid Mr. Carlisle. No provision of the subcontract prohibited the payment of said sum to Mr. Carlisle. A salary paid to a ministerial employee out of the fee received by the Subcontractor is not within the contemplation of any provision of the contract, except Sec. 1h, supra. Mr. Carlisle was not an officer of either corporation composing the joint venture of Evans-Lord Electrical Constructors, and did not participate in any division of the fixed fee paid under the subcontract, except to the extent of the salary paid him.

The subcontract, as reduced to writing, obligated the Subcontractor to "establish and maintain an office *at or near* the site of the work under the full-time resident direction" of a Manager. Such Manager could be an officer of the joint venture of Evans-Lord Electrical Constructors, or some person employed by them to act as such. In either event the salary paid to such Manager was not a reimbursable item of cost under said contract.

■ The phrase "at or near" contained in the foregoing provision of the subcontract is an indefinite, uncertain term. Powell v. Hardy, 89 Minn. 229, 94 N.W. 683; Appeal of Parke, 64 Pa. 137, 141; Shaw v. Davis, 7 Mich. 318. Such phrase, when used in a contract, produces an ambiguity which presents a question of fact for de-

termination by the trier of facts when a contract, containing such term, is presented for construction. The ambiguity produced by said phrase in the instant subcontract permits consideration of evidence establishing the circumstances of the parties as they existed at the time the subcontract was executed, as well as a consideration of evidence establishing an interpretation of such phrase by the parties themselves.

It is manifest, from a reading of the subcontract in question, that the parties intended, by the above contract provision, to require the Subcontractor to maintain "at or near" the site of the work, an office under the full-time direction of some person who could bind the Subcontractor and act on matters relating to the subject matter of the subcontract, and that the management of the subcontract be directed from that office. It is patent from such requirements of the subcontract that the establishment of a mere construction office "at or near the site of the work" in question, where ministerial functions would be performed, would not satisfy the obligation assumed by the Subcontractor. Only the establishment of a managerial business office, at or near the site, would satisfy such contract obligation. When the actual agreement of the parties is considered it is clear that said agreement permits the establishment of a construction office on the site of the work, where ministerial matters would be handled, and a managerial business office "near" the site of such work, from which the management of the contract would be provided. "Near" as used in the above provision of the subcontract is a relative proposition. What was intended thereby is best determined from the agreement and the conduct of the parties in the performance of the subcontract.

If the subcontract, as reduced to writing, actually expresses the agreement made by the parties and the ambiguity therein contained can be given a reasonable interpretation, consonant with the performance of all of the obligations undertaken, as well as fulfillment of all the requirements of said subcontract, then such reasonable interpretation should be given to it.

The evidence clearly establishes that at the time the parties entered into the subcontract it was understood and agreed that no officer of the Evans-Lord Electrical Constructors would devote "whole time" to the project in question. The negotiations carried on between the Prime Contractor and the Subcontractor, prior to the execution of the subcontract, and approved by the Contracting Officer, show that the parties intended and agreed that Mr. Carlisle was to be in full charge of the work to be performed under the subcontract, and be General Manager of the Subcontractor, at the site of the work. At the time such negotiations were carried on and throughout the entire term of the subcontract, the general business office of the Evans-Lord Electrical Constructors was in Kansas City, Missouri. It is readily inferred, from the evidence in this case, that it was the understanding of the parties that although the Subcontractor would have an office on the site of the work and that Mr. Carlisle would be placed in charge of that office, yet, by reason of the close proximity of the general business office of the Evans-Lord Electrical Constructors to the site of the work, which business office would be under the full-time direction of an officer of the joint enterprise of Evans-Lord Electrical Constructors, that the provisions of the subcontract, requiring full-time resident management of an office "near" the site of the work, would be fulfilled. Such understanding is compatible with the terms of the actual agreement made by the parties and as reduced to writing. The fact that the Subcontractor had an office on the site of the work under the supervision of Mr. Carlisle does not change the agreement of the parties. The object to be attained, by having a business office "near" the site of the work, and a ministerial construction office "at" the site of the work, was different. The purpose of having a managerial office of the Subcontractor "near" the site of the work under the full-time direction of a member of the joint venture of the Subcontractor, was to have ready at hand some person who could act on matters of an obligatory character concerning the

subject of the subcontract. The evidence establishes that at the time said subcontract was entered into and during the entire performance of the work thereunder, one or more of the officers of the joint venture were in daily contact with the project work, and that they were fully acquainted with the problems arising during the work of construction and devoted their time to the management of said project from the business office of the joint venture "near the site of the work." There is no evidence in the record of this case that establishes, or even tends to establish, that the work of constructing the project in question was hindered or delayed, or that the Prime Contractor was, in any manner, thwarted in the performance of its contract with the Government, by reason of the management of the work undertaken by the subcontract, being conducted from the business office of the Subcontractor in Kansas City, Missouri. The evidence is all to the contrary and establishes that the Prime Contractor has no complaint to make against the Subcontractor by reason of the manner of the Subcontractor's performance of the work in question. The object to be attained at the office of the Subcontractor, set up on the site of the project, was to place all ministerial work of performing the subcontract under the supervision of that office. The evidence establishes that Mr. Carlisle, while in charge of the office on the site of the work, in performing the duties delegated to him by the Subcontractor, acted in a ministerial, as distinguished from a vice-principal managerial capacity. That such construction office was maintained on the site of the work by the Subcontractor does not militate against any provision of the subcontract as reduced to writing, when the evidence establishes that an office, under the full-time resident management of an officer of the Subcontractor, was maintained "near" the site of the work, on a non-reimbursable basis. It is manifest, from the evidence, that such was the agreement of the parties to the subcontract and that such was the construction given to the above contract provisions by the parties themselves. Especially must such construction prevail when it is shown that the Contracting Officer, who has been given the power by the parties to decide all "disputes concerning questions of fact" arising under the subcontract, has determined that Mr. Carlisle acted in a ministerial capacity, similar to a "General Superintendent of all electrical construction" and that it was "the intent of all parties that O. E. Carlisle, Project Manager, would be on a reimbursable basis" and has recommended that the Prime Contractor reimburse the Subcontractor for the salary paid to Mr. Carlisle. The parties, by their conduct under the subcontract, have manifested that the maintenance of the business office of the Subcontractor in Kansas City, Missouri, 35 miles from the project site, was compliance with the obligation assumed by the Subcontractor to establish and maintain such an office "near" the site of the work. Such interpretation should control when the evidence clearly establishes that it is consonant with the agreement actually made by the parties and as reduced to writing.

The opinion of the Comptroller General is not decisive of the dispute between the parties to the subcontract here involved. Such opinion is binding only on the Executive arm of the Government (McCarl v. Miguel, 62 App.D.C. 259, 66 F. 2d 564) and may be overturned by the Courts. Chesapeake & O. R. Co. v. United States, D.C., 1 F.Supp. 350, 351. The United States Government is not a party to this subcontract and no contractual rights, other than a beneficial interest, exist or can be implied (Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 482, 140 A.L.R. 615; Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L. Ed. 643; Petrin v. United States, 90 Ct. Cl. 670) as between the Subcontractor and the Government. The Subcontractor has completed its work in accordance with the contract it had with the Prime Contractor. If the agreement, as made by the Prime Contractor and the Subcontractor as reduced to writing and as interpreted by said parties, was a violation of the Prime Contractor's contract with the Government, the Subcontractor was not, and cannot be held responsible for the failure of the Prime Contractor to comply with its contract

with the Government. Cf. Collins v. United States, 93 Ct.Cl. 369. Whether the Prime Contractor has, in fact, failed to comply with its contract with the Government we do not decide nor intend to express an opinion on that subject.

 Under the subcontract the Subcontractor was to be reimbursed by the Prime Contractor for the work, done in the same manner and subject to the same conditions as is provided in the principal contract. Such provision of the subcontract is construed to mean that the Subcontractor is to be reimbursed in the same percentage as the Prime Contractor is reimbursed by the Government, when the work is approved by the Contracting Officer. Such provision does not mean that the Subcontractor cannot recover from the Prime Contractor for work approved by the Contracting Officer until the Prime Contractor has first been reimbursed by the Government. Maryland Casualty Co. v. United States, 4 Cir., 108 F.2d 784. If the subcontract was so interpreted the Subcontractor would be remediless in this case. The Subcontractor has no claim against the Government although it has performed its subcontract in full. Collins v. United States, 93 Ct.Cl. 369. The Prime Contractor has now repudiated its agreement with the Subcontractor. The only recourse the Subcontractor now has is a right of action against the Prime Contractor for the amounts due it under the subcontract which the Contracting Officer has approved as reimbursable items of cost. The repudiation by the Prime Contractor, above referred to, is sufficient cause to grant relief to the Subcontractor if, by any stretch of the imagination, it could be held that the subcontract deferred recovery thereunder until the Prime Contractor was first reimbursed by the Government. Equity will not permit the rights of a party to be thus thwarted. Battista v. Horton, Myers & Raymond, 76 U.S.App.D.C. 1, 128 F.2d 29.

From what has been said it is apparent the defendants have no cause of action against the plaintiffs by virtue of their counterclaim.

## Conclusions of Law.

The Court declares the law to be:

(a) That the subcontract in question provides for a job classification of Project Manager, with a salary range of $500–$750 per month, and that the salary to be paid for said job classification is a reimbursable item of cost under said contract;

(b) That O. E. Carlisle's appointment, as Project Manager, having been approved by the Prime Contractor and the Contracting Officer for the Government, and the said O. E. Carlisle having, in fact, acted as Project Manager, the amount of salary paid to O. E. Carlisle, at the rate of $9,000 per year, is a reimbursable item of cost under said subcontract;

(c) That defendants, in violation of the terms of said subcontract, deducted, from the payrolls of plaintiffs, the amount of salary paid by plaintiffs to O. E. Carlisle, as Project Manager, at the rate of $9,000 per year, and plaintiffs are entitled to reimbursement for the total amount of salary so deducted from their payrolls;

(d) That plaintiffs are entitled to recover, under the first count of plaintiffs' petition, the sum of $32,561.60, with interest thereon at the rate of six percent (6%) per annum, from the date on which all sums deducted from plaintiffs' payrolls as and for salary of O. E. Carlisle were made.

(e) That the decision of the Contracting Officer for the Government, to the effect that O. E. Carlisle acted as Project Manager under the subcontract and that his salary, as such, is a reimbursable item of the cost of the work, is conclusive and binding on the parties to said subcontract and cannot be overturned in this action where no fraud or bad faith, on the part of such officer in the making of said decision, is alleged or shown by the evidence;

(f) The Court declares the law to be that the subcontract, by its terms being ambiguous, the Court may consider evidence dehors the contract to establish the meaning and intent of the terms used therein by the parties;

(g) That under the terms of the subcontract reimbursement of the Subcontrac-

tor for the cost of the work performed under the subcontract, is not dependent upon prior reimbursement of the Prime Contractor by the Government;

(h) That defendants are not entitled to recover against plaintiffs on their counterclaim and that said counterclaim should be dismissed.